Michael SCHIAVONE, Plaintiff,

v.

Herbert H. PEARCE, Donald B. Lippincott, Kerr–McGee Corporation, Kerr–McGee Chemical Corporation, and the Penn Central Corporation, Defendants.

Kerr–McGee Chemical Corporation, Third–Party Plaintiff,

v.

Union Camp Corporation, Third–Party Defendant.

No. 3:91 CV 662 CFD.

United States District Court, D. Connecticut.

Dec. 6, 1999.

Nicholas J. Harding, Kosloff & Harding, West Hartford, CT, for Michael Schiavone.

Alan G. Schwartz, Isabel E. Chenoweth, Steven D. Meyers, Wiggin & Dana, New Haven, CT, for Herbert H. Pearce.

Alan G. Schwartz, Isabel E. Chenoweth, Steven D. Meyers, Wiggin & Dana, New Haven, CT, Abbie Eremich, Milford, CT, for Donald B. Lippincott.

Francis J. Brady, Michael J. Donnelly, Gregory A. Sharp, Murtha, Cullina, Richter & Pinney, Hartford, CT, for Kerr McGee Corp.

Michael J. Donnelly, Gregory A. Sharp, Murtha, Cullina, Richter & Pinney, Hartford, CT, for Kerr–McGee Chemical, Ker–McGee Chemical LLC, Kerr McGee Corp.

John F.X. Peloso, Jr., Joseph L. Clasen, Robinson & Cole, Stamford, CT, Diana L. Weiss, James J. Capra, Jr., Kenneth N. Hart, Orrick, Herrington & Sutcliffe, New York, NY, for Penn Central Corp.

Elizabeth C. Barton, Updike, Kelly and Spellacy, P.C., Hartford, CT, for International Paper.

Richard S. Order, Harold Mark Blinderman, Elizabeth C. Barton, Updike, Kelly & Spellacy, P.C., Hartford, CT, for Union Camp Corp.

## RULING ON MOTION FOR SUMMARY JUDGMENT

DRONEY, District Judge.

Defendant and third-party plaintiff Kerr–McGee Chemical LLC ("Kerr–McGee")[1] brings this action against third-party defendant Union Camp Corporation ("Union Camp"). Kerr–McGee claims that Union Camp is liable to it for any damages, costs, and other relief that may be awarded against Kerr–McGee under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), *as amended*, 42 U.S.C. §§ 9601 *et seq.*, and Conn.Gen.Stat. § 22a–452. Union Camp filed the instant motion for summary judgment [Document # 189]. For the reasons set forth below, the motion for summary judgment is GRANTED and the third-party action is DISMISSED.

## I. Background

In *Schiavone v. Pearce*, 79 F.3d 248, 250–51 (2d Cir.1996), the Second Circuit set forth the historical background of this case, as follows:

Union Bag & Paper, the predecessor of Union Camp, formed American Creosoting Corporation ("AmCre Corp.") in 1956 to facilitate Union Camp's acquisition of certain assets from American Creosoting Company. With funds supplied by Union Camp, AmCre Corp., a wholly owned subsidiary of Union Camp, purchased these assets, which included a business on certain leased real property in North Haven, Connecticut. American Creosoting Company had operated a creosoting facility on this property since 1922. On July 24, 1964, Union Camp entered into a stock purchase agreement with Kerr–McGee Oil, the predecessor of Kerr–McGee Corporation, whereby Kerr–McGee acquired AmCre Corp. In Section 4 of this stock purchase agreement ("the indemnification agreement") ... Union Camp agreed to indemnify and hold harmless AmCre Corp. and Kerr–McGee for legal claims and suits filed against them prior to August 1, 1965.... Subsequent to its purchase of AmCre Corp., Kerr–McGee changed the name of AmCre Corp. to Moss American, Inc. ("Moss American"). In 1974[,] Kerr–McGee Chemical Corporation, a subsidiary of Kerr–McGee Corporation, merged with Moss American, assuming all Moss American's liabilities.

A contract between AmCre Corp. and the New York, New Haven and Hartford Railroad Company ("the Railroad"), concerning the operations of the creosoting plant in North Haven, Connecticut ("the plant"), forms the basis of the un-

---

1. On October 12, 1999, the court granted Kerr–McGee Chemical Corporation's motion to substitute Kerr–McGee Chemical LLC as defendant and third-party plaintiff in this action, absent objection.

derlying action. From approximately 1921 through 1966, the Railroad owned the property on which the plant is located and leased it to American Creosoting Company. The property, which changed ownership several times over subsequent years, suffered creosote contamination as a result of the plant's storage, handling, and disposal activities. Prior to September 25, 1984, at the behest of the Connecticut Department of Environmental Protection, the then— owners of the property, defendants Herbert H. Pearce ("Pearce") and Donald B. Lippincott ("Lippincott"), implemented a remedial program to cleanse the land. Their curative efforts, however, were not without critics.

Plaintiff Michael Schiavone, who purchased the property from Pearce and Lippincott by warranty deed on or about October 23, 1984, commenced the underlying lawsuit [in the United States District Court for the District of Connecticut], alleging that Pearce and Lippincott had inadequately remediated the creosote contamination, causing plaintiff to incur substantial clean-up costs. Plaintiff named Kerr–McGee [Corporation and Kerr–McGee Chemical Corporation] as ... defendant[s]. Kerr–McGee impleaded Union Camp, seeking contribution based on Union Camp's management of the plant, through the activities of Union Camp's wholly owned subsidiary and the title owner of the plant, AmCre Corp., from 1956 through 1964.

During that period, Union Camp and AmCre Corp. shared the same board of directors, and several of AmCre Corp.'s high-ranking officers, specifically its president, general counsel, assistant comptroller, and assistant treasurer, were also employed by Union Camp. During the years in question, Union Camp's legal department rendered services to AmCre Corp., including the review and approval of the 1958 renewal of the contract [with the Railroad] concerning the operations of the plant. Kerr–McGee states that several Union Camp employees participated, as officers and directors of AmCre Corp., in the negotiations surrounding the 1958 contract renewal. Kerr–McGee also maintains that during this period, the interlocking Union Camp–AmCre Corp. board of directors examined and approved capital expenditures, including pollution-control equipment, for AmCre Corp.'s creosoting plants. [Union Camp disputes the extent of its employees' participation in the 1958 contract renewal negotiations and in approving AmCre Corp.'s capital expenditures.] It is Kerr–McGee's contention that Union Camp's sustained involvement in the plant's operations reflects an exercise of control by Union Camp sufficient to render Union Camp directly liable for the environmental harm caused.

Union Camp moved for summary judgment on both the CERCLA and state statutory claims. On August 25, 1994, the district court[, Peter C. Dorsey, Chief Judge,] granted the motion, finding that the indemnification agreement shifted all Union Camp's liabilities, including environmental liabilities, to Kerr–McGee. The district court did not address the factual question of the extent of Union Camp's direct liability, if any, as it deemed Kerr–McGee's CERCLA and state statutory claims to be barred, based on the indemnification agreement. On September 14, 1994, Kerr–McGee moved for reconsideration, arguing that the district court had incorrectly interpreted the indemnification agreement and had improperly declined to address the issue of Union Camp's direct CERCLA and state statutory liability.

In an April 18, 1995[ ] ruling, the district court denied Kerr–McGee's motion, and on June 1, 1995, final judgment was entered in favor of Union Camp.

*Id.* (footnotes omitted).

On the entry of judgment in favor of Union Camp, Kerr–McGee appealed the

district court's summary judgment ruling to the Second Circuit. The Second Circuit vacated the ruling and remanded the case to the district court "for a determination of Union Camp's liability under CERCLA § 9607(a)(2) and Conn.Gen.Stat. § 22a–452." *Id.* at 256. In reaching its decision, however, the Second Circuit held that because the indemnification agreement shifted all liability arising from AmCre Corp.'s activities to Kerr–McGee, "Union Camp may be held liable to Kerr–McGee only insofar as that liability derives from Union Camp's own culpable conduct, as distinguished from its former status as the owner of AmCre Corp." *Id.* at 253.[2]

Subsequent to the Second Circuit's remand, the United States Supreme Court decided *United States v. Bestfoods*, 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998), which set forth the circumstances in which a parent corporation, as an operator of a facility, may be held directly liable under CERCLA for pollution at the facility even if the facility is owned by its subsidiary. After the Supreme Court's *Bestfoods* decision, Union Camp filed the instant motion for summary judgment, seeking review of its operator liability for pollution at the North Haven plant.

## II. Standard

In the context of a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." *Miner v. City of Glens Falls*, 999 F.2d 655, 661 (2d Cir. 1993) (internal quotation marks and citation omitted). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.1992) (internal quotation marks omitted) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505), *cert. denied*, 506 U.S. 965, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992). After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"The nonmovant must do more than present evidence that is merely colorable, conclusory, or speculative and must present 'concrete evidence from which a reasonable juror could return a verdict in his favor.'" *Alteri v. General Motors Corp.*, 919 F.Supp. 92, 94–95 (N.D.N.Y.1996) (quoting *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505). A party may not create its own "genuine" issue of fact simply by presenting contradictory or unsupported statements. *See Securities & Exchange Comm'n v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir.1978). When a motion for summary judgment is supported by documentary evidence and sworn affidavits, the nonmoving party must present "significant probative evidence to create a genuine issue of material fact." *Soto v. Meachum*, Civ. No. B–90–

---

2. This holding resolves any indirect liability of Union Camp. Moreover, the evidence presented by Kerr–McGee in opposition to this motion for summary judgment is insufficient under Connecticut law to create a genuine issue of material fact as to whether the corporate veil of Union Camp may be pierced. *See, e.g., Angelo Tomasso, Inc. v. Armor Constr. & Pav-ing, Inc.*, 187 Conn. 544, 447 A.2d 406, 411–13 (1982); *Accashian v. City of Danbury*, No. CV 970147228S, 1999 WL 30594, at *5–6 (Conn.Super.Ct. Jan.8, 1999) (discussing *Bestfoods*, Conn.Gen.Stat. § 22a–452, and piercing the corporate veil); *see also infra* pp. 290–93.

270 (WWE), 1991 WL 218481, at *6 (D.Conn. Aug. 28, 1991).

In ruling on a motion for summary judgment, the court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich,* 963 F.2d at 523. Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991); *see also Suburban Propane v. Proctor Gas, Inc.,* 953 F.2d 780, 788 (2d Cir.1992).

## III. Discussion

Union Camp moves for summary judgment on the ground that, in light of the Supreme Court's *Bestfoods* decision, there are no genuine issues of material fact concerning its liability as an operator of the North Haven plant. In response, Kerr–McGee contends that the Second Circuit's *Schiavone* decision already determined that the question of Union Camp's operator liability presents genuine issues of material fact. Kerr–McGee further contends that the *Bestfoods* decision does not compel reconsideration of the *Schiavone* decision. Alternatively, Kerr–McGee contends that there are genuine issues of material fact concerning Union Camp's operator liability.

### A. The Bestfoods Decision

As indicated above, the Supreme Court's *United States v. Bestfoods* decision set forth the circumstances in which a parent corporation, as an operator of a facility, may be held directly liable under CERCLA for pollution at the facility even if the facility is owned by its subsidiary. The *Bestfoods* Court stated that, "[u]nder the plain language of the [CERCLA] statute, any person who operates a polluting facility is directly liable for the costs of cleaning up the pollution. This is so regardless of whether that person is the facility's owner,

the owner's parent corporation or business partner, or even a saboteur who sneaks into the facility at night to discharge its poisons out of malice." 524 U.S. at 65, 118 S.Ct. 1876 (citation omitted). The Court further held that "under CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility.... [A]n operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Id.* at 66–67, 118 S.Ct. 1876. When imposing direct liability on this ground, however, "it is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's act." *Id.* at 69, 118 S.Ct. 1876 (internal quotation marks omitted). Nor can such liability be established on the ground "that dual officers and directors made policy decisions and supervised activities at the facility." *Id.* at 70, 118 S.Ct. 1876.

The *Bestfoods* Court illustrated three circumstances in which operator liability could apply to a parent corporation. First, the Court recognized that "a parent can be held directly liable when the parent operates the facility in the stead of its subsidiary or alongside the subsidiary in some sort of a joint venture." *Id.* at 71, 118 S.Ct. 1876. Next, "a dual officer or director might depart so far from the norms of parental influence exercised through dual officeholding as to serve the parent." *Id.* Finally, another possibility exists where "an agent of the parent with no hat to wear but the parent's hat might manage or direct activities at the facility." *Id.* The Supreme Court concluded that, in identifying circumstances where operator liability could apply to a parent corporation,

"activities that involve the facility but which are consistent with the parent's investor status, such as monitoring of

the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct [operator] liability. The critical question is whether, in degree and detail, actions directed to the facility by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility."

*Id.* at 72, 118 S.Ct. 1876 (internal quotation marks and citation omitted).

### B. *Schiavone v. Pearce*

As indicated above, Kerr–McGee contends that *Schiavone* already determined that the question of Union Camp's operator liability presents genuine issues of material fact, and that the *Bestfoods* decision does not alter the *Schiavone* decision. In support of its contention, Kerr–McGee cites the following language from *Schiavone:* "The parties debate whether there exists control sufficient for the imposition of operator liability. Such a determination, however, requiring an inherently fact-intensive inquiry—especially where, as here, certain key facts are in dispute—presents a question of fact for resolution at trial." *Plaintiff's Memorandum in Opposition to Motion for Summary Judgment* (*"Plaintiff's Opposition"*) at 10 (quoting 79 F.3d at 255). Kerr–McGee also quotes the Second Circuit's statement that "Union Camp's state statutory liability is to be assessed at the trial-court level." *Id.* at 10 (quoting 79 F.3d at 256). From these excerpts, Kerr–McGee concludes that the *Schiavone* court already rejected the arguments now asserted by Union Camp, based on the same facts.

A careful reading of *Schiavone* reveals, however, that the Second Circuit's opinion did not resolve the nature of the factual disputes concerning Union Camp's operator liability under CERCLA. The Second Circuit confined its *Schiavone* decision to issues concerning the scope of the 1964 indemnification agreement:

The district court did not address the factual question of the extent of Union Camp's direct liability, if any, as it deemed Kerr–McGee's CERCLA and state statutory claims to be barred, based on the indemnification agreement. . . . The question answered by the district court, and thus before this court on appeal, involves the interpretation of contractual language. The precise issue is whether the indemnification agreement transfers Union Camp's direct liabilities to Kerr–McGee.

79 F.3d at 251; *see also Schiavone v. Pearce,* No. 3:91 CV 662(PCD) (D.Conn. Aug. 25, 1994) (granting summary judgment on the basis of the indemnification agreement, without reaching the issue of Union Camp's direct CERCLA liability). Moreover, the *Schiavone* court expressly declined to resolve the question of what control must be exercised by a parent corporation in order for parent operator liability to apply; the court stated that this question "lies beyond the scope of the present appeal." 79 F.3d at 254 & n. 5. Consequently, in light of the *Schiavone* court's clear limitation of the appeal to issues concerning the indemnification agreement, and in light of the court's apparent reluctance to address the question of Union Camp's operator liability, the Second Circuit's two statements about key factual disputes concerning Union Camp's operator liability cannot be interpreted to dispose of the separate issue of whether genuine issues exist concerning disputed facts that are material to the question of Union Camp's operator liability. For this reason, the Second Circuit's *Schiavone* decision does not preclude this court's analysis of Union Camp's operator liability under the *Bestfoods* standard, or this court's granting of summary judgment in favor of Union Camp.

### C. *Bestfoods* Applied to the Instant Case

In determining whether summary judgment is appropriate in this case, the court resolves all ambiguities and draws all in-

ferences in favor of Kerr–McGee, as it must, in order to determine whether there are issues of material fact as to Union Camp's operator liability.

The essential question here is whether there is enough evidence for a reasonable jury to find that Union Camp managed, directed, or conducted operations specifically related to the pollution at the North Haven plant, that is, operations having to do with the leakage or disposal of creosote, or decisions about compliance with environmental regulations. *See* 524 U.S. at 66–67, 118 S.Ct. 1876. In resolving this question, the court must determine whether Union Camp's activities at the North Haven plant are consistent with its parent corporation status; or whether Union Camp's actions directed to the North Haven plant alone are "eccentric under accepted norms of parental oversight of a subsidiary's facility," such as, for example, Union Camp operating in the stead of AmCre Corp. or alongside it in a joint venture. *Id.* at 72, 118 S.Ct. 1876.

There is no dispute that during the years in question, "Union Camp and AmCre Corp. shared the same board of directors, and several of AmCre Corp.'s high-ranking officers, specifically its president, general counsel, assistant comptroller, and assistant treasurer, were also employed by Union Camp." 79 F.3d at 251. Nor is there any dispute that "Union Camp's legal department rendered services to AmCre Corp., including the review and approval of [a] 1958 renewal" of the contract between AmCre Corp. and the Railroad, or that "several Union Camp employees participated, as officers and directors of AmCre Corp., in the negotiations surrounding the 1958 contract renewal." *Id.* The parties further agree that "the interlocking Union Camp–AmCre Corp. board of directors [also] examined and approved capital expenditures, including pollution-control equipment, for AmCre Corp.'s creosoting plants." *Id.*

What is in dispute is whether this involvement and additional involvement by Union Camp in the North Haven plant's operations reflects an exercise of control by Union Camp sufficient to render it directly liable for the environmental harm caused. Kerr–McGee presents the following evidence in support of its argument that genuine issues of material fact exist as to Union Camp's operator status:

1. Union Camp agreed, with its wholly owned subsidiary, AmCre Corp., to "assume and agree to perform all obligations" of American Creosoting Company under the contract between the Railroad and American Creosoting Company, when the assets of American Creosoting Company were purchased by AmCre Corp. *See Plaintiff's Supplemental Statement of Disputed Facts Which Are Material Under the Best-foods Decision ("Plaintiff's Supplemental Facts")* at 3;

2. Union Camp supplied the capital necessary for AmCre Corp. to purchase the assets of American Creosoting Company. *See id.* at 5;

3. Union Camp "played an extremely active role in the management of its wholly owned subsidiary," AmCre Corp. *Plaintiff's Supplemental Opposition* at 9;

4. AmCre Corp.'s board of directors was comprised almost exclusively of Union Camp directors, officers, and employees, and Union Camp installed several of its senior officers in the AmCre Corp. hierarchy. *See id.* at 5; *see also Plaintiff's Supplemental Brief in Opposition to Motion for Summary Judgment ("Plaintiff's Supplemental Opposition")* at 10;

5. The "interlocking" Union Camp and AmCre Corp. boards of directors took actions concerning the allocation of capital expenditures for the North Haven plant, including funds for pollution control equipment at the North Haven plant. *See Plaintiff's Supplemental Facts* at 10–15;

6. Union Camp officials were copied on correspondence related to contract negotiations with the Railroad, and were involved in the supervision of AmCre Corp.'s accounting and corporate affairs. *See id.* at 6–7;

7. "Union Camp recognized that it ... [must] commit itself to the operations of AmCre Corp. in order to maintain relations with AmCre Corp.'s customers." *Plaintiff's Supplemental Opposition* at 4 [3];

8. It was AmCre Corp.'s practice to submit all contracts to Union Camp for review. *See Plaintiff's Supplemental Facts* at 6;

9. A Union Camp in-house lawyer was designated by Union Camp to participate in the contract negotiations with the Railroad and to assist in arranging the sale of AmCre Corp.'s assets to Kerr–McGee. *See Plaintiff's Supplemental Opposition* at 13–14; *see also Plaintiff's Supplemental Facts* at 7, 13–14; and

10. C.W. Mimms, an employee only of Union Camp, "guided" the 1958 contract renewal negotiations with the Railroad, *see Plaintiff's Supplemental Facts* at 8; *see also Plaintiff's Supplemental Opposition* at 12, and "played a direct and decisive role in keeping the North Haven plant open during a period of financial difficulties" in the early 1960s. *Plaintiff's Supplemental Opposition* at 10; *see also Plaintiff's Supplemental Facts* at 8–9.

■ Resolving all ambiguities and drawing all inferences in favor of Kerr–McGee, the court concludes that the evidence described above is insufficient to create genuine issues of material fact under *Bestfoods.*[4] The evidence presented by Kerr–McGee is consistent with the traditional and typical relationship between a parent and subsidiary, in this case Union Camp and AmCre Corp. This evidence is insufficient to establish that Union Camp managed, directed, or conducted operations specifically related to the pollution at the North Haven plant, or had anything to do with the leakage or disposal of creosote, or decisions about compliance with environmental regulations, as required under the Supreme Court's *Bestfoods* decision. *See* 524 U.S. at 66–67, 118 S.Ct. 1876.

Union Camp's agreement to "assume and agree to perform all obligations" of American Creosoting Company is consistent with a parent corporation's typical support of a newly formed subsidiary, in this case, AmCre Corp. In essence, Union Camp guaranteed AmCre Corp.'s performance of the contract with the Railroad, which was taken over by AmCre Corp. from American Creosoting Company, in order to enable AmCre Corp. to keep the contract with the Railroad. *See Plaintiff's Supplemental Facts* Ex. 1. There is no evidence presented by Kerr–McGee to suggest that the Railroad required Union Camp to step in under this guaranty and actually to take over the operations of AmCre Corp. pursuant to it.

The overlapping and intertwined management structure of Union Camp and

---

**3.** According to Kerr–McGee, W.D. Cole, Vice President of Union Camp, recommended in August 1956 that Union Camp "clearly indicate to AmCre Corp.'s customers that it, Union Camp, was committed to the creosoting business." *Plaintiff's Supplemental Opposition* at 14; *see also Plaintiff's Supplemental Facts* at 4. Kerr–McGee also asserts: "In 1957, Mr. Cole proposed immediately selling the creosoting business, or alerting its customers that Union Camp intended to commit itself to that business. It is clear that Union Camp did not sell the business in 1957. Thus, the logical inference is that Union Camp did

alert the various customers (including the ... Railroad) that it was committed to the creosoting operations." *Plaintiff's Supplemental Opposition* at 15; *see also Plaintiff's Supplemental Facts* at 4.

**4.** Because Kerr–McGee fails, as a matter of law, to present sufficient evidence to support its operator liability claims against Union Camp, it is unnecessary for the court to address the factual evidence presented by Union Camp.

AmCre Corp. is also consistent with that of an ordinary parent-subsidiary relationship. As mentioned above, it is undisputed that board members of Union Camp served on AmCre Corp.'s board and certain AmCre Corp. employees were also employed by Union Camp. However, the Supreme Court in *Bestfoods* recognized that those facts alone do not confer operator status upon the parent and are consistent with the traditional parent-subsidiary relationship. *See* 524 U.S. at 69–70, 118 S.Ct. 1876.

Union Camp's supplying AmCre Corp. with the capital necessary to purchase American Creosoting Company is also typical of a parent corporation's investment in a new subsidiary. So too is Union Camp's control of AmCre Corp.'s capital financing and expenditures, including decisions concerning physical improvements to the North Haven plant. *See Sealy Connecticut, Inc. v. Litton Indus.*, No. 3:94 CV 771(JBA), 12–13 (D.Conn. Dec. 31, 1998) (granting summary judgment, under *Bestfoods*, on the basis of similar factual evidence). As to Union Camp's review and approval of the capital budget, the only evidence presented by Kerr–McGee of Union Camp's involvement is the presence of Union Camp officials on AmCre Corp.'s board of directors, *see Plaintiff's Supplemental Facts* Ex. 9, which is consistent with a traditional parent-subsidiary relationship. Moreover, the inclusion of pollution control equipment as part of the capital budget does not demonstrate the direct management of operations related to pollution control required by *Bestfoods*. There is no evidence that Union Camp singled out the pollution control equipment for review or became more deeply involved with that aspect of the capital budget.

The only evidence presented by Kerr–McGee concerning Union Camp's review of AmCre Corp. contracts is an excerpt from a letter indicating that it was AmCre Corp.'s "practice to submit all contracts to [Union Camp]" for review, *see Plaintiff's Supplemental Facts* Ex. 5. That, too, is consistent with Union Camp's parental role and also does not show the direct involvement with pollution control that *Bestfoods* requires. *See Sealy Connecticut, Inc. v. Litton Indus.*, No. 3:94 CV 771(JBA), 12–13 (D.Conn. Dec. 31, 1998). Assigning a Union Camp lawyer to assist in negotiations with the Railroad and other contractual arrangements on behalf of a subsidiary also is consistent with this role. *See id.* As to Mr. Mimms's advising AmCre Corp. in its negotiations with the Railroad, the only evidence presented by Kerr–McGee on that issue is correspondence *to* Mr. Mimms implying that AmCre Corp. officials had spoken to him about the negotiations and seeking his review of a draft letter to the Railroad.[5] *See Plaintiff's Supplemental Facts* Ex. 8; *see also Plaintiff's Opposition* Ex. C. Such involvement, absent additional contrary evidence, is minor and consistent with Union Camp's investor status and supervisory parental responsibilities. *See Sealy Connecticut, Inc. v. Litton Indus.*, No. 3:94 CV 771(JBA), 12–13 (D.Conn. Dec. 31, 1998).

In addition, notwithstanding Kerr–McGee's contentions to the contrary, Union Camp's public "commitment" to the creosoting business is consistent with a parent corporation's support and encouragement of a subsidiary, especially in light of apparent speculation over whether the subsidiary would be sold. Mr. Cole, Vice President of Union Camp, stated:

It is probable that many of [Union Camp's] competitors are endeavoring to instill in the railroad purchasing agents the thought that we may not intend to continue in this business. This will do us considerable harm in our endeavor to build up our contract business with the railroads. I suggest, therefore, that we bring to a speedy conclusion any negoti-

---

5. As evidence of Mr. Mimms's advising AmCre Corp., Kerr–McGee also cites a letter not addressed to Mr. Mimms, and which makes no mention of Mr. Mimms. *See Plaintiff's Supplemental Facts* at 8 & Ex. 7.

ations that we have ... regarding the possible sale of this business.... This is important not only from the standpoint of our relationship with customers of the company, but also with the officers and employees of our new subsidiary.

*Plaintiff's Supplemental Facts* Ex. 2.

Finally, as to Kerr–McGee's general contentions that Union Camp took an active role in managing AmCre Corp., or that Union Camp officials were generally involved in the supervision of AmCre Corp.'s accounting and corporate affairs, Kerr–McGee presents no additional evidence apart from that enumerated above. Moreover, under *Bestfoods,* such claims must relate to pollution control management or decisions, and no evidence is presented to make that connection.

Kerr–McGee has failed to establish that Union Camp's actions directed to the North Haven plant's pollution control were "eccentric under accepted norms of parental oversight" of AmCre Corp. *See* 524 U.S. at 72, 118 S.Ct. 1876. Consequently, the court concludes that the plaintiff's evidence is legally insufficient, under *Bestfoods,* to establish Union Camp's operator liability under CERCLA.[6] The court concludes that no reasonable jury could decide that Union Camp is directly liable as an operator of the North Haven plant.

## IV. State Law Claims

■ Because Union Camp is not directly liable under CERCLA as an operator of the North Haven plant, or indirectly liable under CERCLA or state law, *see* 79 F.3d at 253, Kerr–McGee is not entitled to re-

imbursement from Union Camp under Conn.Gen.Stat. § 22a–452.

The Connecticut statute provides, in relevant part:

(a) Any person, firm, corporation ... which contains or removes or otherwise mitigates the effects of ... hazardous wastes resulting from any discharge, spillage, uncontrolled loss, seepage or filtration of such substance or material or waste shall be entitled to reimbursement from any person, firm or corporation for the reasonable costs expended for such containment, removal, or mitigation, *if such ... hazardous wastes pollution or contamination or other emergency resulted from the negligence or other actions of such person, firm or corporation....*

Conn.Gen.Stat. § 22a–452(a) (emphasis added). The statutory language "negligence or other actions" requires a showing of at least negligence on the part of Union Camp. *See Connecticut Resources Recovery Auth. v. Refuse Gardens, Inc.,* 43 Conn.Supp. 83, 642 A.2d 762, 765 (1993), *aff'd,* 229 Conn. 455, 642 A.2d 697 (1994) (per curiam). This requirement distinguishes CERCLA strict liability from liability under Conn.Gen.Stat. § 22a–452(a). *See id.* Because Kerr–McGee has failed to show that genuine issues of material fact exist as to Union Camp's strict liability under CERCLA, and by implication to show that genuine issues of material fact exist as to Union Camp's causation of the North Haven pollution, as a matter of law, Kerr–McGee has also failed to show that genuine issues of material fact exist as to Union Camp's negligence or fault-based liability under Conn.Gen.Stat. § 22a–

---

**6.** To the extent that Kerr–McGee contends that it is entitled to additional discovery on the issue of Union Camp's operator liability before the court rules on the instant motion for summary judgment, or that a stay on discovery prevented it from adequately investigating the facts in response to the motion for summary judgment, the court granted Kerr–McGee leave to conduct additional discovery and to file supplemental briefs and evidence following the hearing on the motion for summary judgment. *See* Order, Apr. 19, 1999 [Document # 209]. Kerr–McGee then conducted additional discovery and filed a supplemental brief opposing summary judgment on July 28, 1999. *See Plaintiff's Supplemental Opposition.* No motion has been filed to extend the period for such supplemental discovery by Kerr–McGee.

452(a).[7] Consequently, for the reasons set forth above, Union Camp is not responsible for the pollution at the North Haven plant and is not liable to Kerr–McGee for reimbursement under Conn.Gen.Stat. § 22a–452(a) as a matter of law.[8]

## V. Conclusion

For the foregoing reasons, the motion for summary judgment is GRANTED and the third-party action is DISMISSED.

---

**7.** Conn.Gen.Stat. § 22a–452 also "appears to address [] situations where one owner's property is contaminated by hazardous waste from another owner's property." 642 A.2d at 765. In this case, Kerr–McGee's claims arise from its purchase of AmCre Corp. and the North Haven plant from Union Camp, not from contamination of Kerr–McGee property from Union Camp property.

**8.** In its motion papers, Kerr–McGee apparently does not dispute the argument raised by Union Camp in its motion for summary judgment that failure to establish operator liability or vicarious liability under CERCLA precludes liability under Conn.Gen.Stat. § 22a–452.