UNITED STATES of America and the State of Colorado, Plaintiffs, Counter–Defendants, and Third–Party Defendants,

v.

Robert M. FRIEDLAND, Defendant, Counter–Defendant, Counter–Claimant and Third–Party Plaintiff,

v.

Aztec Minerals Corporation, an Ohio corporation; South Mountain Minerals Corporation and Gray Eagle Mining Corporation, a Colorado Corporation, Third–Party Defendants, Counter and Cross–Claimants, and Third–Party Plaintiffs,

v.

Bechtel Corporation; f/k/a Bechtel Civil, Inc., f/k/a Bechtel Civil & Minerals, Inc.; Bank of America National Trust and Savings Association, a national banking association; Industrial Constructors Corporation, a Montana corporation; A.O. Smith Corporation, a New York corporation; Columbia Geostystems, Ltd., f/k/a Columbia Reservoir Systems, Ltd., an Alberta, Canada corporation; GSE Lining Technology, Inc. (as successor to Gundle Lining Systems, Inc., a/k/a Gundle Liner Systems, Inc.), a Delaware corporation; Klohn Leonoff, Inc., a Colorado corporation; Klohn Leonoff, Ltd., in its English form; and Klohn–Leonoff, Liee, in its alternative French form, a British Columbia, Canada Company, Third–Party Defendants and Cross–Claim Defendants.

No. 96–N–1213.

United States District Court, D. Colorado.

July 2, 2001.

Nancy Ann Mangone, Environmental Protection Agency, Denver, CO, Melissa K. Ward, U.S. Environmental Protection Agency, Washington, DC, David Dain, Lois J. Schiffer, John W. Sither, A. Kent Mayo, U.S. Department of Justice, Environmental Enforcement Section, Environment & Natural Resources Division, Washington, DC, Alan David Greenberg, Peter R. Mounsey, John N. Moscato, James D. Freeman, U.S. Department of Justice, Environment & Natural Resources Division, Denver, CO, Richard B. Caschette, Kennedy & Christopher, P.C., Denver, CO, Leonard M. Gelman, Environmental Protection Agency, Environmental Enforcement, Denver, CO, Michael P. Carey, Richard T. Spriggs, U.S. Attorney's Office, Denver, CO, for U.S.

Cheryl A. Linden, Jane T. Feldman, Jennifer Lee Gimbel, Laura Marie Maresca, Attorney General's Office, General Legal Services Section,Denver, CO, Felicity Hannay, Davis, Graham & Stubbs LLP, Denver, CO, Gale A. Norton, Attorney General's Office, Department of Law, Denver, CO, Alan J. Gilbert, Daniel S. Miller, Stephen Marshall Brown, Robert J. Eber, Attorney General's Office, Natural Resources Unit, Denver, CO, Patricia S. Bangert, Powers & Phillips, PC, Denver, CO, Timothy M. Tymkovich, Hale, Hackstaff, Tymkovich & ErkenBrack, LLP, Denver, CO, Robert Reiny Marsh, Attorney General's Office, Criminal Enforcement Division, Denver, CO, Robert D. Clark, Attorney General's Office, Business and Licensing Section, Denver, for State of Colorado.

Frederick J. Baumann, James M. Lyons, Scott Mark Browning, Rothgerber, Johnson & Lyons, LLP,Denver, CO, Lee D. Foreman, Saskia A. Jordan, Haddon, Morgan & Foreman, P.C., Denver, CO, John Dennis Fognani, Christopher L. Thorne, Suzanna K. Moran, Zevnik, Horton, Guibord, McGovern, Palmer & Fognani, LLP, Denver, CO, Craig V. Richardson, Greenberg, Taurig, LLP, Denver, CO, for Robert M. Friedland.

Stanley L. Garnett, Connie Louise Peterson, Mark M. Mathews, Angela Wynn Victoria Jacobs, Amy Monger, Brownstein, Hyatt & Farber, P.C., Denver, CO, Rebecca L. Summerville, Ronald B. MacDonald, Datsopoulos, MacDonald & Lind, PC, Missoula, MT, for Industrial Constructors Corp.

Timothy R. Gablehouse, Donn Lee Calkins, Melanie Joy Granberg, Gablehouse & Epel, LLC, Denver, CO, for Aztec Minerals Corp., Gray Eagle Mining Corporation, South Mountain Minerals Corporation.

Mark A. Wielga, Elizabeth Hope Temkin, Temkin, Wielga & Hardt, L.L.P., Denver, CO, for Cleveland–Cliffs Iron Co., an Union Pacific Resources Co., Union Pacific Resources Group.

Peter John Korneffel, Jr., Brownstein, Hyatt & Farber, P.C., Denver, CO; James A. Clark, Cassandra Gay Sasso, Munir Reza Meghjee, Baker & Hostetler, Denver, CO, for Bechtel Corp.

J. Eric Elliff, Tarek Fathi M. Saad, Morrison & Foerster, Denver, CO, Arne David Wagner, Michele Biegel Corash, Morrison & Foerster, LLP, San Francisco, CA, for Bank of America Nat. Trust and Savings Ass'n.

Richard S. Vermeire, John L. Watson, Craig B. Shaffer, Dianne Michelle Kueck, Moye, Giles, O'Keefe, Vermeire & Gorrell, Denver, CA, Joanne Herlihy, Dufford & Brown, P.C., Denver, CO, for A.O. Smith Corp.

Paul David Phillips, Steven W. Black, Holland & Hart, LLP, Denver, CO, for Columbia Geosystems, Ltd.

William C. Scott, Stuart R. Butzier, Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, NM, Victor F. Boog, Linda Ann Battalora, Victor F. Boog, P.C., Lakewood, CO, for Southway Const. Co., Inc.

Jennifer K. Schreck, Gibson, Dunn & Crutcher, Denver, CO, for Staker Paving and Const. Co., Inc.

James Daniel Levine, Long, Aldridge & Norman, LLP, Atlanta, GA, James T. Markus, John Frederick Young, Block, Marcus and Williams, LLC, Denver, CO, for Geosyntec Consultants, P.C.

Hugh Gottschalk, Terence M. Ridley, Wheeler, Trigg & Kennedy, PC, Denver, CO, for Sun Oil.

## ORDER AND MEMORANDUM OF DECISION

NOTTINGHAM, District Judge.

This is a CERCLA action. Third–Party Defendant and Crossclaim Defendant A.O. Smith Corporation ("A.O.Smith"), moves for summary judgment in its favor on all third-party claims asserted against it by Defendant Robert M. Friedland ("Friedland"), and on all crossclaims asserted against it by third-party defendants Aztec Minerals Corporation, South Mountain Minerals Corporation, Grey Eagle Mining Corporation (collectively "the Aztec Group") and Industrial Constructors Corporation ("ICC"). Specifically, A.O. Smith requests this court to find as a matter of law that it is not liable as an operator or arranger for the release or threatened release of hazardous substances at the Summitville Mine site, pursuant to sections 107 and 113 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C.A. §§ 9607(a), 9613 (West 1995 & Supp.2000). This matter is before the court on "Third–Party Defendant and Crossclaim Defendant A.O. Smith Corporation's Motion for Summary Judgment" filed February 1, 2000. Jurisdiction is based upon 42 U.S.C.A. §§ 9607(a) and 9613(b) and 28 U.S.C.A. § 1331 (West 1993).

### FACTS

During the time in question, A.O. Smith was incorporated as a New York Corporation. (Third–Party Def. and Crosscl. Def. A.O. Smith Corporation's Mem. Br. in Supp. of its Mot. for Summ. J., Statement of Undisputed Material Facts ¶ 1 [filed Feb. 1, 2000] [hereinafter "A.O. Smith's Br."]; admitted in pertinent part at Robert M. Friedland's [Corrected ] Resp. in Opp'n to A.O. Smith Corporation's Mot. for Summ. J., Resp. to Statement of Undisputed Material Facts ¶ 1 [filed Mar. 23, 2000]

[hereinafter "Friedland's Resp."]; Mem. of Industrial Constructors Corp. in Opp'n to A.O. Smith Corporation's Mem. Br. in Supp. of its Mot. for Summ. J., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶ 1 [filed Mar. 17, 2000] [hereinafter "A.O. Smith's Resp."]; *admitted at* Aztec Minerals Corporation's, Gray Eagle Mining Corporation's and South Mountain Minerals Corporation's Resp. in Opp'n to Third–Party Def. and Crosscl. Def. A.O. Smith's Mot for Summ. J., Resp. to Statement of Undisputed Facts ¶ 1 [filed Mar. 17, 2000] [hereinafter "Aztec's Br."].) Mining activity began in the Summit Mining District in Rio Grande County as early as 1873. (*Id.,* Statement of Undisputed Material Facts ¶ 2; *admitted at* Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶ 2; ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶ 2; Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 2.) By 1881, underground mining was taking place and mills were in operation at the Summitville mines. (*Id.,* Statement of Undisputed Material Facts ¶ 2; *admitted at* Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶ 2; ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶ 2; Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 2.)

On June 24, 1933, Summitville Mines Corporation, the owner of mining property at Summitville, granted a lease on that property to B.T. Poxson and George H. Garrey. (*Id.,* Statement of Undisputed Material Facts ¶ 3; *admitted in pertinent part at* Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶ 3; ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶ 3; Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 3.) On or about July 11, 1933, Poxson and Garrey formed Summitville Gold Mines, Inc., a Colorado corporation, and transferred to that company the lease granted to them by Summitville Mines Corporation. (*Id.,* Statement of Undisputed Material Facts ¶ 3; *admitted in pertinent part at* Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶ 3; ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶ 3; Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 3.) On July 29, 1933, Poxson and Garrey formed a second Colorado corporation, Summitville Leasing Company. (*Id.,* Statement of Undisputed Material Facts ¶ 3; *admitted in pertinent part at* Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶ 3; ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶ 3; Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 3.) There is a dispute as to whether or not Poxson and Garrey had any connection to A.O. Smith. (*Id.,* Statement of Undisputed Material Facts ¶ 3; *denied in part at* Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶ 3; ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶ 3; Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 3.)

To raise additional capital to develop the Summitville mining properties on a larger scale, in early 1934, Poxson and Garrey entered into an agreement with a group of individual investors led by Walter E. Faithorn (the "Faithorn Group"). (*Id.,* Statement of Undisputed Material Facts ¶ 4; *admitted in pertinent part at* Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶ 4; ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶ 4; Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 4.) Under the terms of this agreement, the Summitville Leasing Company exchanged its leases in return for 320,000 shares of stock in a new company, Summitville Consolidated Mines, Inc. ("SCMI"); the Faithorn Group received 232,000 shares of the

SCMI shares received by Summitville Leasing Company, in exchange for an investment of $200,000. (*Id.*, Statement of Undisputed Material Facts ¶ 4; *admitted in pertinent part at* ¶ 4; ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶ 4; Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 4.) In April 1934, L.R. Smith, A.O. Smith's chairman, invested $50,000, twenty-five percent of the $200,000 invested in SCMI by the Faithorn Group. (*Id.*, Statement of Undisputed Material Facts ¶ 5; *admitted in pertinent part at* Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶ 5; ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶ 5; Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 5.) There is a dispute as to whether or not any of SCMI's capital was contributed by A.O. Smith or whether A.O. Smith was an initial shareholder of SCMI. (*Id.*, Statement of Undisputed Material Facts ¶ 4; *denied in part at* Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶ 4; ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶ 4; Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 4.) Specifically, there is a question as to whether or not L.R. Smith's contribution was made in his individual capacity or as chairman of A.O. Smith. (*Id.*, Statement of Undisputed Material Facts ¶¶ 4–5; *admitted in pertinent part at* Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶¶ 4–5; ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶¶ 4–5; Aztec's Resp., Resp. to Statement of Undisputed Facts ¶¶ 4–5.)

On April 28, 1934, SCMI was organized as a Colorado corporation. (*Id.*, Statement of Undisputed Material Facts ¶ 6; *admitted at* Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶ 6; ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶ 6; Az-

tec's Resp., Resp. to Statement of Undisputed Facts ¶ 6.) SCMI's initial directors were Faithorn, Garrey, Poxson, Charles Renshaw, and Charles King; its initial officers were Poxson (president), Garrey (first vice-president and general manager), and Faithorn (second vice-president, secretary and treasurer). (*Id.*, Statement of Undisputed Material Facts ¶ 6; *admitted at* Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶ 6; ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶ 6; Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 6.) There is no evidence that, at the time of SCMI's formation in April 1934, any of its directors or officers were employed by or otherwise associated with A.O. Smith. (*Id.*, Statement of Undisputed Material Facts ¶ 6; *admitted at* Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶ 6; ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶ 6; Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 6.) The By–Laws adopted by SCMI's board of directors on April 28, 1934, provided, in pertinent part, that the corporation's general manager shall:

> have charge of the mining and milling operations of the Company ..., and he shall have full authority with reference to the active mining and milling operations of the Company, ... and shall determine what development work, construction work, prospecting, metallurgical testing, mining and milling operations shall be done by or for the Company ....

(*Id.*, Ex. M–1 [Minutes of First Meeting of the Board of Directors of SCMI at 7].) At the same meeting, SCMI's board of directors elected Garrey to the office of general manager. (*Id.*, Statement of Undisputed Material Facts ¶ 7; *admitted at* Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶ 7; ICC's

Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶ 7; Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 7.)

On October 1, 1934, the Summitville Mines Corporation, as lessor, and SCMI, as lessee, negotiated a lease as to certain real estate and mining properties situated in the Summit Mining District.[1] (*Id.*, Statement of Undisputed Material Facts ¶ 8; *admitted at* ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶ 8; *admitted in pertinent part at* Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 8.) The lease expressly provided that, upon termination of the lease:

> any permanent improvements owned by lessee on said leased land, and especially said mill concentrating and reduction plant, shall be and become the sole property of the lessor . . . all rights and privileges used in connection with said mill, the land on which it stands, . . . shall be considered a part and parcel of the mill property, and shall, upon the termination of this lease for any cause, become the sole property of the lessor.

(*Id.*, Statement of Undisputed Material Facts ¶ 8; *admitted at* ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶ 8; Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 8.) The lease further stated that "all machinery, equipment, buildings and improvement or other real fixtures installed by the lessee, upon the leased premises . . . shall upon any termination of this lease, become the property of lessor." (*Id.*, Statement of Undisputed Material Facts ¶ 8; *admitted at* ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶ 8; Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 8.)

A 1934 Bureau of Mines Report identified SCMI as the operator of the Summitville mines, under lease from the owner, Summitville Mines Corporation. (*Id.*, Statement of Undisputed Material Facts ¶ 9; *admitted at* Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶ 9; ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶ 9; Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 9.)

In 1934, at Garrey's direction, SCMI rehabilitated certain of the old tunnels and more important underground workings at the Summitville mine, and constructed a 2,650 foot-long tram line to transport ores to the new mill, with the intention to increase:

> the efficiency of [SCMI's] mining methods and operations so that we are able to send an ever-increasing tonnage of higher average grade ores to the mill in addition to mining and sending out as large tonnages of the higher grade shipping ores as is possible . . . [and] with a view to extending our operations into new and wider areas, and also to open up as many new stopes as possible so that we may be able to increase our production as results may warrant.

(*Id.*, Statement of Undisputed Material Facts ¶ 10; *admitted at* Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶ 10; ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed

---

1.  Friedland notes that, because Exhibit N–1, a copy of the purported lease, is an unsigned copy that contains numerous marginalia and a note on its cover page reading "revised October 1, 1934," he denies that the document accurately reflects the content of any final lease issued to SCMI or A.O. Smith for the mining properties at the Summitville Mine and therefore contends that the facts surrounding the lease of mining properties at the Summitville Mine from 1934 through 1942 are in dispute. (Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶ 8.) Friedland's objection is noted, but does not affect my analysis.

Facts ¶ 10; *admitted in pertinent part at* Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 10.) By the end of 1934, SCMI had completed construction on a 100–ton per day combination flotation and cyanidation mill and sent the first shipment of flotation concentrates from the mill. (*Id.,* Statement of Undisputed Material Facts ¶ 11; *admitted at* Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶ 11; ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶ 11; *admitted in pertinent part at* Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 11.) In his First Annual Report to SCMI shareholders, Garrey stated that his policy was "to increase tonages put through the mill, and to lower costs of treatment" and to install "such new equipment or machinery as is deemed necessary to accomplish the desired results." (*Id.,* Ex. L–1 [First Annual Report at 5–6].)

In November 1934, SCMI employees at the Summitville mine began construction of a retaining dike to divert tailings from Wightman Creek. (*Id.,* Statement of Undisputed Material Facts ¶ 12; *admitted at* Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶ 12; *admitted in pertinent part at* ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶ 12; Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 12.) On November 26, 1934, Thornton informed Poxson, SCMI's president, "[w]e have the first tailings dam nearly completed. It is our intention to build one below this in order to keep the tailings out of the river. This is in accordance with instructions from Mr. Garrey." (*Id.,* Statement of Undisputed Material Facts ¶ 12; *admitted at* Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶ 12; *admitted in pertinent part at* ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶ 12; Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 12.) By December 12, 1934, SCMI had completed the construction of two tailings dams at the Summitville mine. (*Id.,* Statement of Undisputed Material Facts ¶ 12; *admitted at* Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶ 12; *admitted in pertinent part at* ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶ 12; Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 12.) There is a dispute as to whether or not the tailings dams were successful in preventing tailings from entering Wightman Creek. (*Id.,* Statement of Undisputed Material Facts ¶ 12; *denied in part at* ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶ 12.) Garrey supervised SCMI operations at Summitville until the flotation-cyanidation mill was completed and Summitville Mine was operating on a substantial producing basis late in 1935. (*Id.,* Statement of Undisputed Material Facts ¶ 13; *admitted in pertinent part at* Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶ 13; Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 13.)

At a special shareholders' meeting held on November 6, 1935, new directors and officers of SCMI were elected. (*Id.,* Statement of Undisputed Material Facts ¶ 14; *admitted in pertinent part at* Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶ 14; *admitted at* ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶ 14; Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 14.) The new directors were L.R. Smith, L.L. Warriner, Garrey, Poxson, and Stamm; the new officers were Warriner (president and general manager), Garrey (vice president and chief geologist), Poxson (secretary), and Stamm (treasurer). (*Id.,* Statement of Undisputed Material Facts ¶ 14; *admitted in pertinent part at* Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶ 14; *admitted at* puted Material Facts ¶ 14; *admitted at*

ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶ 14; Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 14.)

A.O. Smith held 537,308 shares—approximately sixty-seven percent—of SCMI stock as of July 31, 1936, through at least July 31, 1941; it did not, however, characterize SCMI as a wholly-owned subsidiary of A.O. Smith. (*Id.,* Statement of Undisputed Material Facts ¶ 15; *admitted at* Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶ 15; *admitted in pertinent part at* ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶ 15; Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 15.)

From 1935 through July 31, 1942, A.O. Smith's board of directors consisted of L.R. Smith, W.C. Heath, R.F. Bell, John M. Floyd, J.P. Kelley, John Leekley and Walter Kasten (as well as C.C. Joys from 1937 through 1939). (*Id.,* Statement of Undisputed Material Facts ¶ 16; *admitted at* ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶ 16; Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 16; *admitted in pertinent part at* Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶ 16; *admitted in pertinent part at* A.O. Smith Corporation's Consolidated Reply Br. in Supp. of its Mots. for Summ. J. as to Cls. Asserted by Robert M. Friedland, the Aztec Group and Industrial Constructors Corporation, A.O. Smith's Reply to Friedland's Resp. to its Statement of Undisputed Material Facts ¶ 16 [filed Apr. 21, 2000] [hereinafter "A.O. Smith's Reply"].) During this same period, L.R. Smith and John Leekley were the only A.O. Smith directors who also served on the SCMI board of directors; other A.O. Smith employees who served as directors of SCMI included J.J. Stamm and H.F. Detrick. (*Id.,* Statement of Undisputed Material Facts ¶ 16; *admitted at* ICC's Resp.,

ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶ 16; Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 16; *admitted in pertinent part at* Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶ 16; *admitted in pertinent part at* A.O. Smith's Reply, A.O. Smith's Reply to Friedland's Resp. to its Statement of Undisputed Material Facts ¶ 16.) Furthermore, from 1935 through July 31, 1942, A.O. Smith's corporate officers were L.R. Smith (chairman of the board), W.C. Heath (president); R.F. Bell, John M. Floyd, and Rudolph Furrer (vice-presidents); and Stamm (secretary and treasurer). (*Id.,* Statement of Undisputed Material Facts ¶ 17; *admitted at* ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶ 17; Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 17; *admitted in pertinent part at* Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶ 17.) During this same period, Stamm was the only A.O. Smith officer who also served as an officer (treasurer) of SCMI. (*Id.,* Statement of Undisputed Material Facts ¶ 17; *admitted at* ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶ 17; *admitted in pertinent part at* Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶ 17; Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 17.) There is a dispute, however, as to whether or not other A.O. Smith employees served as officers of SCMI. (*Id.,* Statement of Undisputed Material Facts ¶ 17; *denied in part at* Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶ 17; Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 17.)

On October 17, 1935, R.M. Kanik assumed the position of manager of operations for SCMI, "responsible to [SCMI] for the operation of Summitville Mines". (*Id.,* Statement of Undisputed Material Facts ¶ 18; *admitted in pertinent part at* Friedland's Resp., Resp. to Statement of Undis-

puted Material Facts ¶ 18; ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶ 18; Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 18.)

SCMI regularly filed annual reports with the Colorado Secretary of State. (*Id.*, Statement of Undisputed Material Facts ¶ 20; *admitted at* Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶ 20; ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶ 20; Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 20.) A.O. Smith and SCMI had separate financial statements. (*Id.*, Statement of Undisputed Material Facts ¶ 21; *admitted at* Fried-

land's Resp., Resp. to Statement of Undisputed Material Facts ¶ 21; Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 21.) A.O. Smith consistently referred to SCMI as a subsidiary corporation, and not as a division or department. (*Id.*, Statement of Undisputed Material Facts ¶ 22; *admitted at* Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶ 22; ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶ 22; *admitted in pertinent part at* Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 22.) SCMI's financial statements consistently reflected that assets greatly exceeded liabilities during the relevant time period, as the following table shows:

| Year Ending | Current Assets | Current and Contingent Liabilities | Capital Stock and Surplus |
| --- | --- | --- | --- |
| December 31, 1934 | $3,211,053.73 | $ 31,654.82 | $3,179,398.91 |
| July 31, 1936 | $3,830,783.98 | $274,577.30 | $3,556,206.68 |
| July 31, 1937 | $3,815,925.03 | $381,825.96 | $3,434,099.07 |
| July 31, 1938 | $3,714,952.53 | $282,201.29 | $3,444,774.68 |
| July 31, 1939 | $3,594,181.03 | $222,843.48 | $3,384,213.70 |
| July 31, 1940 | $3,473,000.78 | $141,422.91 | $3,342,945.07 |
| July 31, 1941 | $3,381,785.47 | $ 72,355.05 | $3,309,430.42 |

(*Id.*, Statement of Undisputed Material Facts ¶ 23; *admitted at* Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶ 23; ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶ 23; *admitted in pertinent part at* Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 23.) During the relevant time period, SCMI either showed small profits or small losses, as the following table indicates:

| Year Ending | Gross Sales | Net Income |
| --- | --- | --- |
| July 31, 1936 | $329,504.78 | ($ 3,184.16) |
| July 31, 1937 | $500,676.92 | ($64,452.98) |
| July 31, 1938 | $670,719.93 | $74,518.37 |
| July 31, 1939 | $538,789.20 | ($ 219.08) |
| July 31, 1940 | $586,932.28 | $26,331.52 |
| July 31, 1941 | $582,795.98 | $55,739.62 |

(*Id.*, Statement of Undisputed Material Facts ¶ 24; *admitted at* Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶ 24; ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶ 24; *admitted in pertinent part at* Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 24.)

According to a Bureau of Mines Inspector's Report, in October 1939, SCMI constructed a tailings pond, which was projected to "take care of the tailings for the next three years or more." (*Id.*, Statement of Undisputed Material Facts ¶ 25;

admitted in pertinent part at Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶ 25; ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶ 25; Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 25.) Further extensions to the tailings impoundment dam were constructed in 1940. (Id., Statement of Undisputed Material Facts ¶ 25; admitted in pertinent part at Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶ 25; ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶ 25; Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 25.)

In July 1942, the federal government issued Order L–208 forcing all gold mining operations to close for the duration of World War II. (Id., Statement of Undisputed Material Facts ¶ 27; admitted at Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶ 27; ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶ 27; Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 27.) On July 31, 1942, SCMI was dissolved and the lease on the Summitville mining properties was relinquished. (Id., Statement of Undisputed Material Facts ¶ 27; admitted at Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶ 27; Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 27.) Any connection that A.O. Smith had with mining and milling activity at the mining site ended in July 1942 with the dissolution of SCMI. (Id., Statement of Undisputed Material Facts ¶ 28; admitted at Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶ 28; admitted in pertinent part at Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 28.) On July 30, 1942, Summitville Mines Corporation and Gold Links Mine, a copartnership comprised of Poxson and Garrey, executed a lease with respect to real estate and mining property, together with all improvements, mill tramways, buildings, machinery and equipment appurtenant to such property, situated in the Summit Mining District. (Id., Statement of Undisputed Material Facts ¶ 29; admitted in pertinent part at Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶ 29; ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶ 29; Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 29.)

On May 20, 1999, Friedland filed an amended third-party complaint alleging that A.O. Smith is liable as an owner, operator, and/or arranger for disposal at the Summitville Mine under CERCLA sections 107 and 113. (Friedland's Am. Third–Party Compl. [filed May 20, 1999].) Upon being named as third-party defendants by Friedland, the Aztec Group filed cross-claims against A.O. Smith on August 2, 1999, adopting by reference Friedland's allegations. (Aztec Group's Answer Am. Third–Party Compl., and Countercls., Cross–Cls. and Third–Party Compl. [filed Aug. 2, 1999].) On December 23, 1999, after being named as a direct defendant by the United States and the State of Colorado, ICC filed a third-party complaint against A.O. Smith, adopting by reference Friedland's allegations. (Industrial Constructors Corp.'s Crosscls. and Third–Party Compls. [filed Dec. 23, 1999].) On February 1, 2000, A.O. Smith moved for summary judgment on all claims of Friedland, the Aztec Group, and ICC. (Third–Party Def. and Cross–Cl. Def. A.O. Smith Corporation's Mot. for Summ. J. [filed Feb. 1, 2000].)

## ANALYSIS

### 1. Legal Standard

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and the ... moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Concrete Works, Inc. v. City & County of Denver,* 36 F.3d 1513, 1517 (10th Cir.1994). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp.,* 477 U.S. at 325, 106 S.Ct. at 2554. "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc.,* 36 F.3d at 1518 (citing *Celotex Corp.,* 477 U.S. at 325, 106 S.Ct. at 2554). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. at 2553; *see* Fed.R.Civ.P. 56(e). " 'Only disputes over facts that might affect the outcome of the suit under governing law will preclude the entry of summary judgment.' " *Sanchez v. Denver Pub. Schs.,* 164 F.3d 527, 531 (10th Cir.1998) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2505). The court may consider only admissible evidence when ruling on a summary judgment motion. *See World of Sleep, Inc. v. La–Z–Boy Chair Co.,* 756 F.2d 1467, 1474 (10th Cir.1985). The factual record must be viewed in the light most favorable to the nonmoving party. *Concrete Works, Inc.,* 36 F.3d at 1518 (citing *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 [10th Cir.1990] ).

### 2. CERCLA Liability

■ CERCLA creates a regime of broad-ranging liability, permitting the government to recover its response costs incurred in remedying environmental hazards posed by hazardous waste sites directly from parties responsible for pollution, as well as authorizing private parties to pursue contribution or indemnification from potentially responsible parties for expenses incurred responding to environmental threats. *See* 42 U.S.C.A. §§ 9607, 9613. The primary purpose of CERCLA is "to encourage quick response and to place the cost of that response on those responsible for the hazardous conditions." *Control Data Corp. v. S.C.S.C. Corp.,* 53 F.3d 930, 936 (8th Cir.1995). To establish a *prima facie* case of liability in a CERCLA cost recovery or contribution action, a plaintiff must prove: (1) the Summitville Mine is a "facility" as defined in 42 U.S.C.A. § 9601(9); (2) the defendant is a "responsible person" as defined in 42 U.S.C.A. § 9607(a); (3) the release or threatened release of a hazardous substance has occurred; and (4) the release or threatened release has caused the plaintiff to incur response costs. *FMC Corp. v. Aero Indus.,* 998 F.2d 842, 845 (10th Cir.1993). Only the second element—whether A.O. Smith is a "responsible person" under CERCLA—is at issue in this case.

To establish liability under CERCLA, a plaintiff must show that a defendant is within one of the four classes of covered persons enumerated in 42 U.S.C.A. § 9607(a). Third-party plaintiffs contend that A.O. Smith owned or operated the Summitville Mine and/or arranged for the disposal of hazardous substances at the Summitville Mine and is therefore a responsible person enumerated in sections 107(a)(2) or (3) of CERCLA. 42 U.S.C.A. §§ 9607(a)(2), (3).[2]

**2.** Third-party plaintiffs offer no evidence to support their claim of "owner" liability against A.O. Smith. Accordingly, I find such claim meritless and to the extent third-party plaintiffs claims are premised upon owner

#### a. Operator Liability

In *United States v. Bestfoods,* the Supreme Court examined the circumstances in which a parent corporation could be liable under CERCLA as an "owner" or "operator" for the environmental damage its subsidiary had caused. 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998). Justice Souter's majority opinion held: (1) when (but only when) the corporate veil may be pierced, a parent corporation may be charged with derivative CERCLA liability for its subsidiary's actions in operating a polluting facility; and (2) a corporate parent that actively participated in, and exercised control over, the operations of its subsidiary's facility may be held directly liable in its own right under § 107(a)(2) as an operator of the facility. *Id.* at 64–67, 118 S.Ct. 1876. Third-party plaintiffs contend that, under either theory of liability, A.O. Smith's actions at the Summitville Mine from 1934 through 1942 constitute a foundation for CERCLA liability. (Friedland's Resp. at 30.) A.O. Smith, however, contends that third-party plaintiffs cannot produce evidence sufficient to warrant a trial on either theory. (A.O. Smith's Br. at 13.) I agree with A.O. Smith.

#### i. Derivative Liability: Piercing the Corporate Veil

In *Bestfoods,* the Court noted that there is no indication that CERCLA was intended to displace fundamental principles of state corporations law. *Bestfoods,* 524 U.S. at 63, 118 S.Ct. at 1876. Specifically, the Court affirmed the Sixth Circuit's holding that "the corporate veil may be pierced and the shareholder held liable for the corporation's conduct when, *inter alia,* the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud, on the

liability, A.O. Smith is entitled to summary

shareholder's behalf." *Id.,* 524 U.S. at 62, 118 S.Ct. 1876.

In *Micciche v. Billings,* 727 P.2d 367 (Colo.1986), the Colorado Supreme Court discussed the doctrine of corporate veil piercing under Colorado law:

Generally, a corporation is treated as a legal entity separate from its shareholders, thereby permitting shareholders to commit limited capital to the corporation with the assurance that they will have no personal liability for the corporation's debts. Krendl & Krendl, *Piercing the Corporate Veil: Focusing the Inquiry,* 55 Den. L.J. 1 (1978). When, however, the corporate structure is used so improperly that the continued recognition of the corporation as a separate legal entity would be unfair, the corporate entity may be disregarded and corporate principals held. liable for the corporation's actions. *Id.* at 2. Thus, if it is shown that shareholders use the corporate entity as a mere instrumentality for the transaction of their own affairs without regard to separate and independent corporate existence, or for the purpose of defeating or evading important legislative policy, or in order to perpetuate a fraud or wrong on another, equity will permit the corporate form to be disregarded and will hold the shareholders personally responsible for the corporation's improper actions.

*Micciche,* 727 P.2d at 372–73. In determining whether a subsidiary should be regarded as the mere instrumentality of its parent, the following facts should be taken into consideration:

(1) The parent corporation owns all or [a] majority of the capital stock of the subsidiary. (2) The parent and subsidiary corporations have common directors or officers. (3) The parent corporation

judgment.

finances the subsidiary. (4) The parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation. (5) The subsidiary has grossly inadequate capital. (6) The parent corporation pays the salaries or expenses or losses of the subsidiary. (7) The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation. (8) In the papers of the parent corporation, and in the statements of its offices, "the subsidiary" is referred to as such or as a department or division. (9) The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take direction from the parent corporation. (10) The formal legal requirements of the subsidiary as a separate and independent corporation are not observed.

*Fish v. East,* 114 F.2d 177, 191 (10th Cir. 1940) (applying Colorado law).[3] I shall now undertake an analysis of third-party plaintiffs claim that A.O. Smith's and SCMI's corporate form should be disregarded by utilizing the factors identified in *Fish.*

### A. A.O. Smith's Ownership of All or a Majority of the Capital Stock of SCMI

It is undisputed that A.O. Smith held 537,308 shares—approximately 67 percent—of SCMI stock as of July 31, 1936 through at least July 31, 1941. (A.O. Smith's Br., Statement of Undisputed Material Facts ¶ 15; *admitted at* Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶ 15; *admitted in pertinent part at* ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts

¶ 15; Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 15.) A.O. Smith, therefore, owned a majority—but never all—of the capital stock of its subsidiary.

### B. Common Directors or Officers of A.O. Smith and SCMI

It is further undisputed that, from 1935 to July 31, 1942, A.O. Smith and SCMI had common directors and officers: L.R. Smith and John Leekley both served as directors common to both A.O. Smith and SCMI and J.J. Stamm was treasurer of both companies. (*Id.,* Statement of Undisputed Material Facts ¶ 16; *admitted at* ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶ 16; Aztec's Resp., Resp. to Statement of Undisputed Facts ¶ 16; *admitted in pertinent part at* Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶ 16; *admitted in pertinent part at* A.O. Smith's Reply, A.O. Smith's Reply to Friedland's Resp. to its Statement of Undisputed Material Facts ¶ 16.)

### C. A.O. Smith's Financing of SCMI

█ It is undisputed that A.O. Smith contributed $50,000 to the Summitville Mine and that L.R. Smith invested at least $110,000 of his own money. (A.O. Smith's Reply at 38.) The $110,000.00 "investment" by L.R. Smith, more properly designated as a loan, however, was made in his individual capacity, not on behalf of A.O. Smith. (Friedland's Resp., Ex. B [Herbert Decl., Ex. 14].) Furthermore, the evidence before this court indicates that the $50,000.00 "contribution" by A.O. Smith and L.R. Smith is also more properly designated a loan, that appears to have

---

**3.** Although no uniform direction has emerged in the federal courts as to whether state or federal common law on corporate veil piercing applies to CERCLA cases, I have chosen to proceed under a state law analysis in light

of the parties decision to do so. I express no opinion as to which body of law is more proper, and defer the issue for resolution at a later date. Furthermore, under either approach, the result would not differ.

been paid in full. (A.O. Smith's Reply, Exs. C–2–G–2 [Financial Statements], G–4 [noting that SCMI would not pay dividend until liquidation of its note indebtedness to L.R. Smith and A.O. Smith].) Absent evidence that these loans were made for an improper purpose, financial assistance provided to a subsidiary by a parent does not support piercing the corporate veil. *Lowell Staats Mining Co., Inc. v. Pioneer Uravan, Inc.*, 878 F.2d 1259, 1263 (10th Cir.1989).

### D. A.O. Smith's Subscription to All the Capital Stock of SCMI or Otherwise Causing Its Incorporation

The Aztec Group concedes that, although A.O. Smith held a majority of stock in SCMI at all times, it "did not cause the incorporation of SCMI." (Aztec Group's Resp. at 12.) Friedland simply reiterates the majority position of A.O. Smith as well. (Friedland's Resp. at 55.) It does not follow that, by simply holding a majority position, one causes its incorporation. Third-party plaintiffs have presented no evidence to suggest, let alone prove, that A.O. Smith was involved in SCMI's incorporation.

### E. SCMI's Grossly Inadequate Capitalization

■ Friedland argues that "[n]o evidence has been introduced by A.O. Smith showing that the assets of A.O. Smith and SCMI at all relevant times was sufficient to establish the viability and corporate independence of SCMI." (Friedland's Resp. at 55.) The Aztec Group, moreover, notes that it is not in a position to determine if SCMI was grossly undercapitalized. (Aztec Group's Resp. at 12.) As the party piercing the veil, it is third-party plaintiffs burden to put forth evidence. *See Smithour v. American Dream Enters., Inc.*, 778 P.2d 302, 304 (Colo.App.1989) ("To impose personal liability upon the shareholders of the corporation, it was claimants' burden

to establish [the applicability of the corporate veil piercing doctrine].") Accordingly, I find no evidence of grossly inadequate capitalization in this case.

### F. A.O. Smith's Payment of the Salaries, Expenses or Losses of SCMI

There is no evidence that A.O. Smith paid the losses of SCMI. Friedland, however, contends that A.O. Smith Corporation paid the salary of L.R. Smith for his time spent on SCMI's board of directors and that it paid certain of SCMI's operating expenses. (Friedland's Resp. at 55.) Furthermore, the Aztec Group notes that A.O. Smith paid the expenses of some SCMI employees. (Aztec Group's Resp. at 11.) A.O. Smith concedes that it provided minimal financing to SCMI on a sporadic basis for a limited period of time ending in April 1936. (A.O. Smith's Br. at 25.) The evidence cited by third-party plaintiff suggests, at best, that A.O. Smith assumed the salary of L.R. Smith for his service on SCMI's board of directors as well as the expenses of a few of its employees. (A.O. Smith's Br., Ex. M–2.). SCMI's financial statements reflect that it generated sufficient income from its mining operations to pay the salaries and expenses of its employees for much of the relevant time period. (*Id.*, Statement of Undisputed Material Facts ¶¶ 23–24; *admitted at* Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶¶ 23–24; ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶¶ 23–24; *admitted in pertinent part at* Aztec's Resp., Resp. to Statement of Undisputed Facts ¶¶ 23–24.) Such sporadic payments do not demonstrate that SCMI was merely a conduit for A.O. Smith's funds. Furthermore, the evidence suggests that, although A.O. Smith advanced small amounts of money to SCMI for certain expenses, those advances were largely for amounts which had been erroneously billed to A.O. Smith rather than to SCMI, and that A.O. Smith consis-

tently indicated that it expected SCMI to repay it, and carefully documented, segregated and accounted for any expenses which it paid on SCMI's behalf. (A.O. Smith's Br., Exs.—2, X–2.)

### G. SCMI Has Substantially No Business Except With A.O. Smith or No Assets Except Those Conveyed by A.O. Smith

The Aztec Group notes that it does not possess documents indicating with whom SCMI did most of its business. (Aztec Group's Resp. at 13.) The only evidence put forth by third-party plaintiffs suggesting that A.O. Smith did *any* business with SCMI reflects ore shipments to A.O. Smith's research department in January and February 1936, for which A.O. Smith invoiced SCMI. (Friedland's Resp, Statement of Additional Disputed Facts ¶¶ 37–39; *admitted in pertinent part at* A.O. Smith's Reply, A.O. Smith's Resp. to Friedland's Statement of Additional Disputed Facts ¶¶ 37–39.) Absent more evidence, such isolated shipments simply cannot demonstrate that SCMI had substantially no business except with A.O. Smith, especially in light of A.O. Smith's eight-year investment in SCMI,

### H. References by A.O. Smith in its Papers, and in the Statements of its Officers, as "the Subsidiary" or as a Department or Division

A.O. Smith acknowledges that SCMI is referred to as a subsidiary in its audited financial statements. (A.O. Smith's Br. at 27.) There is no evidence that A.O. Smith referred to SCMI as a department or division.

### I. The Independence of the Directors or Executives of SCMI acting in the Interest of SCMI, Rather Than Taking Direction From A.O. Smith

There is a dispute as to whether or not Mr. Garrey and Mr. Poxson, both employ-ees of A.O. Smith during all relevant times, acted independently in their association with SCMI or took directives from A.O. Smith. (Friedland's Resp., Statement of Additional Disputed Facts ¶¶ 1–2, 6–7, 8–9, 11; *denied in part at* A.O. Smith's Reply, App. A [Response Concerning (Friedland's) Additional Disputed Facts ¶¶ 1–2, 6–7, 8–9, 11].)

### J. The Observation of the Formal Legal Requirements of SCMI as a Separate and Independent Corporation

Third-party plaintiffs put forth no evidence demonstrating that SCMI failed to observe corporate formalities, and third-party plaintiffs concede they possess no such evidence. (Aztec Group's Resp. at 14–15; Friedland's Resp. at 54.)

■ Based upon my analysis of the foregoing factors—taken in the light most favorable to third-party plaintiffs—I cannot agree that A.O. Smith so controlled the operations of SCMI such that the corporate veil should be pierced. First, although A.O. Smith owned a majority of the stock in SCMI, this fact alone is not enough to justify disregarding the corporate form. *See Industrial Comm'n v. Lavach*, 165 Colo. 433, 439 P.2d 359, 361 (1968). Second, although A.O. Smith and SCMI shared two common directors and one common officer—L. R. Smith, John Leekley, and J.J. Stamm, respectively—such overlap is insufficient to warrant piercing the corporate veil. *See Yoder*, 900 F.Supp. at 244 (*citing Quarles v. Fuqua Indus.*, Inc., 504 F.2d 1358, 1364 [10th Cir.1974]) ("Identity of directors, however, has been held to be innocuous where, as here, there is no evidence that through the board the parent controlled the subsidiary."). Finally, the parties dispute the extent to which, if at all, SCMI's directors or executives acted independently in the interest of SCMI, or rather, took direction

from the parent corporation. Viewing the facts in a light most favorable to third-party plaintiffs, they have, therefore, arguably established three factors.

The remaining factors, however, favor A.O. Smith. The record reveals no evidence that: (1) A.O. Smith financed SCMI—other than the loans made; (2) A.O. Smith caused SCMI's incorporation; (3) SCMI was grossly undercapitalized; (4) A.O. Smith paid the salaries, expenses or losses of SCMI, with the exception of a few minor advances for certain SCMI expenses, as discussed above, that should more properly be viewed as a loan; (5) SCMI has substantially no business except with A.O. Smith or no assets except those conveyed to SCMI by A.O. Smith; (6) SCMI is referred to as a department or division; or (6) the formal legal requirements of SCMI as a separate and independent corporation were not observed by A.O. Smith. Viewing the facts in the light most favorably to third-party plaintiffs, I find that SCMI was neither an instrumentality nor alter ego of A.O. Smith. Therefore, to the extent third-party plaintiffs claims are premised upon a derivative liability theory, A.O. Smith is entitled to summary judgment.

### ii. Direct Liability:

A.O. Smith may nevertheless be liable under CERCLA if it is found directly liable for the operation of the Summitville Mine. As the Court noted in *Bestfoods*,

> There are ... instances ... in which the parent has not sufficiently overstepped the bounds of corporate separateness to warrant piercing, yet is involved enough in the facility's activities that it should be held liable as an operator. Imagine, for example, a parent who strictly observed corporate formalities, avoided intertwining officers and directors, and adequately capitalized its subsidiary, yet provided active, daily supervision and control over hazardous waste disposal

activities of the subsidiary. Such a parent should not escape liability just because its activities doe not justify a piercing of the subsidiary's veil.

*Bestfoods*, 524 U.S. at 66 n. 12, 118 S.Ct. 1876 (citations omitted). The court held that "[u]nder the plain language of the [CERCLA] statute, any person who operates a polluting facility is directly liable for the costs of cleaning up the pollution. This is so regardless of whether that person is the facility's owner, the owner's parent corporation or business partner, or even a saboteur who sneaks into the facility at night to discharge its poisons out of malice." *Id.* at 65, 118 S.Ct. 1876. Therefore, I now address whether or not A.O. Smith's activities were sufficient to invoke CERCLA operator liability, as that term has been defined by statute and case law.

In interpreting a congressional statute, my analysis normally begins with the statutory language itself. CERCLA's definition of "operator," however, necessitates a deviation from this common course of reasoning. The phrase "operator," tautologically defined by Congress as "any person ... operating" a facility, is anything but a model of legislative draftsmanship. 42 U.S.C.A. § 9601(20)(A)(ii). The circularity of this definition renders it useless and has prompted the Supreme Court to sharpen the definition of "operator" for purposes of CERCLA's concern with environmental contamination:

> [U]nder CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility.... [A]n operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.

*Bestfoods*, 524 U.S. at 66–67, 118 S.Ct. at 1876. When imposing direct liability on

this ground, however, the Court noted that "it is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's act." *Id.* at 69, 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed.2d 43. Nor can such liability be established on the ground "that dual officers and directors and supervised activities at the facility." *Id.* at 70, 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed.2d 43.

■ The Court recognized three scenarios under which a parent may be held directly liable as an operator. First, the Court recognized that "a parent can be held directly liable when the parent operates the facility in the stead of its subsidiary or alongside the subsidiary in some sort of a joint venture." *Id.* at 71, 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed.2d 43. Next, "a dual officer or director might depart so far from the norms of parental influence exercised through dual office-holding as to serve the parent." *Id.* Final-

ly, another possibility, suggested by the facts of *Bestfoods* itself, exists where "an agent of the parent with no hat to wear but the parent's hat might manage or direct activities at the facility." *Id.* The Court concluded that, in identifying circumstances where operator liability could apply to a parent corporation:

> "[a]ctivities that involve the facility but which are consistent with the parent's investor status, such as monitoring of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability." The critical question is whether, in degree and detail, actions directed to the facility by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility.

*Id.* at 72, 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed.2d 43 (citations omitted). Finally, for one to be considered an operator, there must be some nexus between that person's or entity's control and the hazardous waste contained in the facility.[4] *Geraghty &*

4. The dominant explication of the language, adopted by the First, Second, Third, Fifth, Sixth, Seventh, Eighth, and Eleventh Circuits, has looked to actual control, seeing an "operator" as someone actively involved in running the facility, typically on a day-to-day, managerial basis. *See, e.g., United States v. Cordova Chem. Co.*, 113 F.3d 572, 579–81 (6th Cir. 1997); *Redwing Carriers, Inc. v. Saraland Apts.*, 94 F.3d 1489, 1504–05 (11th Cir.1996); *Schiavone*, 79 F.3d 248, 253–54 (2d Cir.1996); *United States v. Gurley*, 43 F.3d 1188, 1193 (8th Cir.1994); *John S. Boyd Co., Inc. v. Boston Gas Co.*, 992 F.2d 401, 408 (1st Cir.1993); *Lansford–Coaldale Joint Water Auth. v. Tonolli Corp.*, 4 F.3d 1209, 1220–22 (3d Cir.1993); *Joslyn Manuf. Co. v. T.L. James & Co., Inc.*, 893 F.2d 80, 83 (5th Cir.1990); *Edward Hines Lumber Co. v. Vulcan Materials Co.*, 861 F.2d 155, 157–59 (7th Cir.1988). But other circuits, such as the Fourth Circuit, have opted for a broader interpretation of "operator," taking it to include not only those persons with actual control over a facility, but also "a party who possessed the authority to abate

the damage caused by the disposal of hazardous substances but who declined to actually exercise that authority by undertaking efforts at a cleanup." *Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 842 (4th Cir.1992). *See also (Kaiser Aluminum & Chem. Corp. v. Catellus Dev. Corp.*, 976 F.2d 1338, 1341 [9th Cir.1992]) (holding, as a "well-settled rule," that " 'operator' liability under section 9607(a)(2) attaches if the defendant had authority to control the cause of the contamination at the time the hazardous substances were released into the environment"); *CPC Int'l, Inc. v. Aerojet–General Corp.*, 731 F.Supp. 783, 788 (W.D.Mich.1989) ("The most commonly adopted yardstick for determining whether a party is an owner-operator under CERCLA is the degree of control that party is able to exert over the activity causing the pollution."). Without adopting a particular interpretation I find that, under either definition, there are sufficient issues of material fact to preclude the entry of summary judgment at this stage.

*Miller, Inc. v. Conoco Inc.*, 234 F.3d 917, 928 (5th Cir.2000).

To support its proposition that A.O. Smith directly operated the Summitville Mine, third-party plaintiffs cite *Browning–Ferris Industries v. Ter Maat*, 13 F.Supp.2d 756 (N.D.Ill.1998), *aff'd in part and rev'd in part*, 195 F.3d 953 (7th Cir. 1999), a case which examined the liability of parent or sister corporations. Third-party plaintiffs argue that A.O. Smith took many of the same actions vis-a-vis the Summitville Mine as the parent corporation—which the court found liable under CERCLA—took in *Browning–Ferris.* Specifically, third-party plaintiffs contend:

● *An officer and director of the parent was involved in decision-making at the site:* L.R. Smith, an officer and director of A.O. Smith, was involved in decision making at the site; A.O. Smith Board Minutes indicate that A.O. Smith's mines are being operated under the direction of L.R. Smith; Mr. Smith often visited the Summitville Mine; in 1935, Mr. Smith ordered an active development campaign; Mr. Smith was asked by engineers at Summitville what capacity in tons the mine should be operated, and what equipment should be used to reach that capacity; Mr. Smith ordered an investigation of ore difficulties; Mr. Smith studied and implemented designs for mill location, tailing disposal, water and power at Summitville; Mr. Smith sent A.O. Smith engineers to Summitville to operate the mine; and Mr. Smith personally conducted mining experiments to develop mining equipment and methods that might be applied to Summitville.

● *The subsidiary paid the parent a management fee for performing functions relating to the site for the subsidiary:* A.O. Smith invoiced SCMI for design, construction, and operation services of A.O. Smith engineers relating, in part, to mill location, tailing disposal, water and power.

● *Outside parties considered A.O. Smith to be the operator of the site:* SCMI's general manager told creditors in August 1935 "we are going under the control of the A.O. Smith Corporation." Furthermore, creditors subsequently sent correspondence and invoices to "A.O. Smith Corporation, Monte Vista, Colorado." Finally, SCMI's general manager in 1936 told creditors "[t]he property is controlled by Mr. Smith, I am merely a hired man in charge of operations."

● *Officers of the parent sent correspondence to parties about the site:* A.O. Smith employees conveyed orders regarding mine operations on A.O. Smith letterhead to its agents, and to SCMI officials.

(Friedland's Resp. at 47.)

Friedland's reliance *Browning–Ferris* is misplaced. As noted by Friedland, the court's decision was based, in large part, upon the fact that: (1) the subsidiary paid the parent a management fee for performing administrative functions for the subsidiary relating to the site; (2) numerous outside parties who were involved with the site, including the state environmental protection agency and waste haulers, considered the parent to be the operator; (3) the president of the parent sent letters to the state environmental protection agency pertaining to operational matters at the site which he signed as president of the parent; and (4) the parent's environmental consultant sent correspondence to the parent and its president which discuss pollution and cleanup issues at the site.

These factors simply are not present in the case at hand. First, there is no evidence that SCMI paid A.O. Smith a management fee for performing functions relating to the site. Rather, the evidence

cited merely references a few isolated incidents wherein A.O. Smith sent SCMI an invoice for its services at Summitville in March of 1936 as well as a document referencing an invoice for $50 per day to cover the Milwaukee billing which provided for A.O. Smith's engineering work and salaries attributable to SCMI. (Friedland's Resp., Ex. A [Neumann Decl., Ex. 10, 28].) Such isolated invoices are simply not comparable to the management fee paid in *Browning–Ferris*. Second, although Friedland has cited isolated occasions in October 1935 where creditors sent invoices to A.O. Smith, these documents cannot outweigh the undisputed fact that regulatory authorities charged with overseeing the Summitville Mine consistently acknowledged SCMI as the operator. (A.O. Smith's Br., Ex. O–1, K–2, L–2.)

Third, there is no evidence that L.R. Smith was not involved in decision-making at the Summitville Mine site in his role as president of A.O. Smith. Most of the correspondence from Mr. Smith relating to SCMI cited by third-party plaintiffs was in actuality written on personal letterhead, as opposed to A.O. Smith stationary. (Friedland's Resp., Ex. B [Herbert Decl., Exs. 35–36, 38].) The only piece of correspondence written on A.O. Smith stationary, addressed to Mr. Garrey, simply cannot be considered an "order" by L.R. Smith in his capacity as president of A.O. Smith. The letter states, in pertinent part:

> Another matter which I believe is extremely acute is the need for your mature judgment at Summitville. I am quite convinced that a considerable amount of money is being wasted steadily on driving tunnels there, which is done to the best of their judgment, but without the keen geological help that you could supply. You spoke some time ago of getting over to Summitville to do a lot of mapping for you which would help you materially. Has he enough to do at King Solomon, where it is so near

the finish of the program there, but what [sic] he could moved over to Summitville permanently for the time being and, if necessary, Hunt could run up for a day or two once every ten days at King Solomon to keep them straight? I am very anxious to give Summitville a fair show at some of your time, as we have a perfectly stupendous investment there now and we are not going the way we should be at all.

> My personal feeling is that Summitville should have two uninterrupted weeks of your time, just the very first minute you can make it, and that should be not later than three weeks from now, without it just ruins the whole situation at Manhattan Of course, I feel Manhattan is so important that if necessary we can just mark time and lose the money at Summitville in order to not start Manhattan off with a bad start by your absence. But if you can possibly consolidate yourself into a program that will not neglect Summitville much longer and still let us be making headway at Manhattan, I would appreciate it very much.

(Friedland's Resp., Ex. B [Herbert Decl., Ex. 34].) As the letter indicates, this was no more than a request by L.R. Smith for Mr. Garrey to give his expert opinion on a subject that he too was equally interested in the success of—Summitville Mine. A.O. Smith was simply concerned that one of its subsidiary's investments was wasting money and therefore requested an expert look into the matter. Because this request was predominantly a financial concern, I find that such conduct is not atypical—let alone eccentric—under accepted norms of parental oversight of a subsidiary's facility.

Furthermore, the letters to which Friedland refers indicating that SCMI was "going under the control of A.O. Smith," and that "Mr. Smith" controlled the property is entirely consistent with A.O. Smith's status

as a parent corporation. The undisputed facts show that SCMI (specifically Garrey) had made all fundamental decisions concerning the development of the facility (such as the construction of underground tunnels and infrastructure, the flotation-cyanidation mill, and tailings dams) by the end of 1934, before A.O. Smith even became an SCMI shareholder. (A.O. Smith's Br., Statement of Undisputed Material Facts ¶¶ 10–13; *admitted in pertinent part at* Friedland's Resp., Resp. to Statement of Undisputed Material Facts ¶¶ 10–13; ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶¶ 10–13; Aztec's Resp., Resp. to Statement of Undisputed Facts ¶¶ 10–13.) Unlike the letters at issue in *Browning–Ferris,* moreover, which were specifically sent to or from the state environmental protection agency and the parent's environmental consultant, the letter cited by Friedland do not relate to pollution or pollution control activities. In light of the foregoing, I find that *Browning–Ferris* is an inappropriate case by which I should guide my decision. Rather, I find the decision in *Schiavone v. Pearce,* 77 F.Supp.2d 284 (D.Conn.1999), to contain a fact-pattern more analogous to the case at hand.

In *Schiavone,* the court considered the application and extension of operator-type liability under CERCLA. The court found that the evidence revealed the following: (1) the parent and subsidiary had dual officers and directors; (2) the subsidiary used the parent's legal department; (3) the subsidiary ordinarily provided copies of contracts to the parent for review; (4) a parent employee solely guided the negotiations concerning contract renewals with the owner of the polluted site; (5) the parent corporation kept the subsidiary operating during times of financial difficulties; and (6) parent officers were copied on correspondence related to the subsidiary, including environmental issues. *Id.* at 291–92. After noting that the facts re-

vealed an overlapped and intertwined management structure, the court found no sufficient evidence to show that the parent corporation had managed, directed, or conducted operations related to the pollution in question or had influenced policy with respect to environmental decisions. *Id.* Thus, the court held that the parent's activities were typical of those one would expect of a parent and largely unrelated to pollution control management or decisions. *Id. See also Datron, Inc. v. CRA Holdings, Inc.,* 42 F.Supp.2d 736, 748 (W.D.Mich. 1999) (holding summary judgment appropriate where claimant's "patchwork of examples" failed to demonstrate that parent operated the facility); *United States v. Green,* 33 F.Supp.2d 203 (W.D.N.Y.1998) (finding that, despite evidence demonstrating that Green owned and exercised control over subsidiary as president and treasurer, there was no evidence that he was personally involved in the operations "specifically related to the pollution or the leakage ... of hazardous wastes at [the facility]"). Neither the Aztec Group nor ICC attempt to distinguish *Schiavone* or *Datron,* and Friedland's counsel offers no attempt to reconcile those decisions except for the patently self-serving statement that *Schiavone* and *Datron* "offer [no] guidance on the issue of A.O. Smith's liability in this case." Nevertheless, I find *Schiavone* to be on point.

Third-party plaintiffs also point to other facts, not considered by the *Browning–Ferris* court, to support its argument that A.O. Smith is an operator under CERCLA:

- A.O. Smith's chief geologist, Mr. Garrey, remained associated with SCMI operations after his employment with A.O. Smith began on May 2, 1935;

- A.O. Smith mining engineers frequently visited the Summitville Mine;

• A.O. Smith shipped ore to Milwaukee, Wisconsin for analysis in order to develop improved equipment and methods for mine operations;

• A.O. Smith determined the ore throughput for the Summitville Mine;

• A.O. Smith established a Denver office for its Mining Department;

• In 1936, Mr. Heath of A.O. Smith assumed responsibility for certain aspects of the operation of the Summitville Mine; and

• A.O. Smith ordered Mr. Garrey to submit frequent reports containing recommendations for modifications to mining operations.

(Friedland's Resp. at 48.) None of these factors, even if taken as true, affect my decision. As indicated by the Court in *Bestfoods*, to be liable as an operator under CERCLA, an individual must "manage, direct, or conduct operations *specifically related to pollution*, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Bestfoods*, 524 U.S. at 66–67, 118 S.Ct. at 1876 (emphasis add-

ed). Third-party plaintiffs have not proffered evidence demonstrating A.O. Smith involvement as such. The "evidence" supplied by third-party plaintiffs pertains to A.O. Smith's alleged participation in SCMI's activities rather than those of the Summitville Mine site, or pertains to acts by A.O. Smith which were, in degree and detail, natural for a parent rather than "eccentric," as expressly required by *Bestfoods*. Under either of the three scenarios presented by the Court under which a parent may be held directly liable as an operator, I find that A.O. Smith's activities do not rise to the level of operator. To the extent third-party plaintiffs claims are premised upon a direct theory of operator liability, A.O. Smith is entitled to summary judgment.[5]

### b. Arranger Liability [6]

Alternatively, third-party plaintiffs contend that A.O. Smith falls within the third class of responsible persons in section 9607(a), enumerated in 42 U.S.C.A. § 9607(a)(3):

---

5. The Aztec Group points to several documents purporting to demonstrate that A.O. Smith exercised a great control over operations at the Summitville Mine site, noting that "these documents strongly suggest that A.O. Smith Corporation actively participated in, and exercised control over, the operations of its subsidiary, SCMI, and its subsidiary's facility at Summitville." (Aztec Group's Resp. at 9.) With respect to direct liability, however, the Aztec Group misunderstands the standard to be applied: focus must be placed upon the relationship between parent and facility, as opposed to parent and subsidiary. As the Court noted in *Bestfoods:*

  If, however, direct liability for the parent's operation of the facility is to be kept distinct from derivative liability for the subsidiary's own operation, the focus of the inquiry must necessarily be different under the two tests. "The question is not whether the parent operates the subsidiary, but rather

whether it operates the facility, and that operation is evidenced by participation in the activities of the facility, not the subsidiary. Control of the subsidiary, if extensive enough, gives rise to indirect liability under piercing doctrine, not direct liability under the statutory language".
524 U.S. 51, 68, 118 S.Ct. 1876, 141 L.Ed.2d 43 (citations omitted).

6. Though the Court in *Bestfoods* did not directly address the circumstances in which a parent of a subsidiary with involvement can be held liable as an "arranger," I find no rational basis for departing from the *Bestfoods* standards in that context. *See Carter–Jones Lumber Co. v. Dixie Distributing Co.*, 166 F.3d 840 (6th Cir.1999) (applying *Bestfoods* to arranger liability under 107[a][3] of CERCLA). Because I have already discussed derivative liability, however, I will not reiterate it here.

any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances ... shall be liable.

42 U.S.C.A. § 9607(a)(3).[7] In response, A.O. Smith argues that it neither owned or possessed the hazardous substances nor did it arrange for the disposal of hazardous substances at the Summitville Mine, and therefore cannot be held liable as an arranger under CERCLA.

▮ A *prima facie* case of arranger liability requires a showing that: (1) the substances disposed of were "hazardous" under CERCLA; (2) the liable party "owned or possessed" the substances; and (3) the liable party "arranged for" disposal of the substances. 42 U.S.C.A. § 9607(a)(3); *Raytheon Constructors, Inc. v. ASARCO Inc.,* No. 96 N 2072, 1998 WL 1742603, *9 (D.Colo. April 17, 1998) (citation omitted). In *Raytheon,* this court followed the holding of a previous Colorado district court case which had adopted the Eleventh Circuit's standard for arranger liability: a case-by-case approach in the determination of whether a party has arranged for the disposal of hazardous substances, including consideration of factors such as intent, ownership, and knowledge. *Id.* (citing *Mathews v. Dow Chem. Co.,* 947 F.Supp. 1517, 1525 [D. Colo.1996] [citing *South Fla. Water Mgmt. Dist. v. Montalvo,* 84 F.3d 402, 406–407 (11th Cir.1996) ] ). Again, I see no reason to depart from the analysis outlined in those cases.

It is undisputed that hazardous substances were disposed of from 1934 to 1942. A.O. Smith contends, however, that it neither owned or possessed the hazardous substances, nor arranged for their disposal. (A.O. Smith's Reply at 31–35.)

Determining whether A.O. Smith owned or possessed the waste—or, alternatively, "constructively" owned or possessed the waste—for purposes of CERCLA "requires a further inquiry into [A.O. Smith's] 'nexus with the actual owner or possessor' or 'exercise of control' over the waste." *Raytheon,* 1998 WL 1742603 at *9 (citation omitted). Most courts that have held defendants liable as arrangers have found that the responsible party had some actual involvement in the decision to dispose of the waste. *Id.* (citing *General Elec. Co. v. AAMCO Transmissions, Inc.,* 962 F.2d 281, 286 [2nd Cir.1992] ). *See also Hassayampa Steering Comm. v. Arizona,* 768 F.Supp. 697, 702 (D.Ariz.1991) (asserting constructive ownership or possession is "usually evidenced by having the authority to decide on behalf of the owner where the waste would be deposited"). Here, A.O. Smith neither controlled, nor had the authority to control, the decision where to deposit the waste rock at the Summitville Mine.

▮ The record before the court indicates that A.O. Smith exercised no decision-making control with regard to the disposal of the hazardous waste rock at the Summitville Mine. Friedland contends that "A.O. Smith constructively owned or possessed the mining wastes disposed of at the Site from 1934–1942 because it [possessed] a 'clear nexus' with both SCMI, the operator of the Mine, and the disposal of the waste." (Friedland's Resp. at 52.) To support such a proposition, Friedland cites the following facts:

7. Neither the Aztec Group nor ICC proffer arguments regarding A.O. Smith's potential liability as an "arranger" under CERCLA.

First, officers, directors, and agents of A.O. Smith were intensely involved in making operational decisions at the Summitville Mine, a service for which A.O. Smith regularly billed SCMI. *See, e.g.,* Facts ¶¶ 40–43. In fact, SCMI required weekly reports from A.O. Smith, detailing costs for operating the Mine. *Id.,* ¶¶ 57, 63. Another obvious example of A.O. Smith's "clear nexus" with the disposal of wastes at the Site is the fact that it constructed no fewer than five tailings dams, the ultimate disposal areas of ming wastes at the Site, between 1934 and 1938. *See* discussion, *supra* (A.O. Smith Statement of Undisputed Facts ¶¶ 12, 25; Facts ¶¶ 55, 56.)

These facts, despite Friedland's insistence, do not reveal that A.O. Smith constructively owned or possessed the mining wastes disposed of at the Summitville Mine from 1934 to 1942. First, as discussed above, the "operational decisions" for which A.O. Smith "regularly billed" SCMI were neither. The evidence cited by Friedland merely references a few isolated incidents wherein A.O. Smith sent SCMI an invoice for its services at Summitville in March of 1936 as well as referencing an invoice for $50 per day to cover the Milwaukee billing which provided for A.O. Smith's engineering work and salaries attributable to SCMI. (Friedland's Resp., Statement of Additional Disputed Facts ¶¶ 40–43.) Furthermore, the undisputed facts show that SCMI (specifically Garrey) had made all fundamental decisions concerning the development of the facility (such as the construction of underground tunnels and infrastructure, the flotation-cyanidation mill, and tailings dams) by the end of 1934, before A.O. Smith even became an SCMI shareholder. (A.O. Smith's Br., Statement of Undisputed Material Facts ¶¶ 10–13; *admitted in pertinent part at* Friedland's

Resp., Resp. to Statement of Undisputed Material Facts ¶¶ 10–13; ICC's Resp., ICC's Resp. to A.O. Smith's Statement of Undisputed Facts ¶¶ 10–13; Aztec's Resp., Resp. to Statement of Undisputed Facts ¶¶ 10–13.) The evidence cited as support for the proposition that A.O. Smith constructed the tailings dams merely speaks to their existence and does not discuss the circumstances surrounding the construction of tailings dams at the Summitville Mine, does not attribute that construction to any particular individual, nor make any reference of any kind to A.O. Smith. (Friedland's Resp., Ex. A [Neumann Decl., Ex. 39].) Thus, the evidence cited by Friedland simply does not establish that A.O. Smith constructively owned or possessed the hazardous substances. (Friedland's Resp., Statement of Additional Disputed Facts ¶¶ 55–57.)

Based on the foregoing, I find that A.O. Smith possessed no discretionary authority with respect to disposal of the waste rock, and therefore neither owned nor possessed (either directly or constructively) the Summitville Mine waste. Thus, I find that A.O. Smith is not liable as an arranger under CERCLA in light of third-party plaintiffs' failure to proffer sufficient facts necessary to establish their *prima facie* case of arranger liability under CERCLA. To the extent third-party plaintiffs' theory of liability is predicated on a theory of arranger liability, A.O. Smith's motion for summary judgment is granted.

### 3. Conclusion

Based on the foregoing, it is therefore ORDERED as follows:

1. A.O. Smith's motion for summary judgment (# 714–1) is GRANTED.

2. Friedland's alternative rule 56(f) motion (# 933–1) is DENIED AS MOOT.[8]

8. In light of the fact that Friedland's Alternative Rule 56(f) motion was filed approximate-

3. Friedland's motion to strike (# 934–1) is DENIED AS MOOT.[9]

4. A.O. Smith's motion to strike (# 1034–1) is DENIED AS MOOT.

ly 15 months ago, I deem it withdrawn. Friedland has had sufficient time to review any "newly discovered evidence" and file a supplemental motion for summary judgment. Any "injustice" that Friedland claims to have suffered in light of the "newly discovered" evidence at the time his motion for summary judgment was filed has been alleviated.

9. Friedland's arguments concerning the documents submitted by A.O. Smith are noted. However, A.O. Smith subsequently submitted affidavits and documents authenticating its evidence, thereby curing all procedural defects. (Third–Party Def. and Crossel. Def. A.O. Smith Corporation's Br. in Opp'n to Robert M. Friedland's Mot. to Strike Evidence and Statements of Undisputed Material Facts Submitted in Supp. of A.O. Smith Corporation's Mot. for Summ. J. Exs. 1–7 [filed Apr. 21, 2000].)